1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO**

**KELLOGG USA, INC., et al.,**

        **Plaintiffs,**

                v.

**B. FERNANDEZ HERMANOS, INC., et al.,**

        **Defendants.**

                                        **Civil No. 07-1213 (GAG/BJM)**

<u>**OPINION AND ORDER**</u>

        Plaintiffs Kellogg USA, Inc. ("KUSA") and Kellogg Caribbean Services Co., Inc. ("KCSI") brought this action against, B. Fernandez Hermanos, Inc. ("BFH") and Caribbean Warehouse Logistics, Inc. ("CWL"), seeking to execute the bond that BFH and CWL posted in relation to the preliminary injunction issued in a previous case (<u>See</u> Civil No. 05-1030 (JP)).  BFH and CWL, in turn, filed a counterclaim alleging the same claims that were raised in the previous complaint, which involve alleged impairment of the parties' distributor relationship in violation of the Puerto Rico Dealers's Act, Law No. 75 of June 24, 1964, P.R. Laws Ann. tit. 10, §§ 278, et seq. ("Law 75").

        The parties have filed cross motions for summary judgment (Docket Nos. 231, 232), and have submitted statements of uncontested material facts (Docket Nos. 233, 234).  They have also duly opposed their opponents' motions for summary disposition (Docket Nos. 245, 243) and replied (Docket Nos. 248, 250).  For the reasons discussed below, the court **DENIES** the defendants' motion (Docket Nos. 231 & 233), and **DENIES in part and GRANTS in part** the plaintiffs' motion (Docket Nos. 232 & 234).

**I.      Standard of Review**

        Summary Judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986).  "An issue is genuine if 'it may reasonably be resolved in favor of either party' at trial, and material if it

'possess[es] the capacity to sway the outcome of the litigation under the applicable law.'" Iverson v. City of Boston, 452 F.3d 94, 98 (1st Cir. 2006) (alteration in original) (citations omitted).  The moving party bears the initial burden of demonstrating the lack of evidence to support the non-moving party's case.  Celotex, 477 U.S. at 325.  The nonmoving party must then "set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e).  If the court finds that some genuine factual issue remains, the resolution of which could affect the outcome of the case, then the court must deny summary judgment.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

When considering a motion for summary judgment, the court must view the evidence in the light most favorable to the non-moving party and give that party the benefit of any and all reasonable inferences. Id. at 255. "This framework is not altered by the presence of cross-motions for summary judgment." Cochran v. Quest Software, Inc., 328 F.3d 1, 6 (1st Cir. 2003) (citing Blackie v. Maine, 75 F.3d 716, 721 (1st Cir. 1996) (explaining that, in conducting a canvass of the record, the court must mull each motion separately, drawing inferences against each movant in turn)).  At the summary judgment stage, the court does not make credibility determinations or weigh the evidence. Id.  Summary judgment may be appropriate, however, if the non-moving party's case rests merely upon "conclusory allegations, improbable inferences, and unsupported speculation." Forestier Fradera v. Municipality of Mayaguez, 440 F.3d 17, 21 (1st Cir. 2006) (quoting Benoit v. Technical Mfg. Corp., 331 F.3d 166, 173 (1st Cir. 2003)).

## II.     Factual & Procedural Background

BFH is a corporation organized and existing under the laws of the Commonwealth of Puerto Rico.  It is engaged primarily in the business of importing, distributing and selling food products, grocery products and liquors in Puerto Rico.  CWL, also a Puerto Rico corporation, is organized by and affiliated to BFH.  CWL was organized in 2003 and provides logistics and transportation services at the request of BFH to the latter's clients.

KUSA is a corporation organized under the laws of, and doing business in, the state of Michigan.  It manufactures Kellogg products for sale in the United States and export to other countries through other Kellogg subsidiaries and distributors.  KCSI is a corporation organized and

existing under the laws of Puerto Rico since 1993.  Both KUSA and KCSI are subsidiaries of The Kellogg Company ("Kellogg").  Kellogg Sales Company ("KSC"), also a subsidiary of Kellogg, merged into KUSA in 2002.  KUSA, KCSI, KSC, and another company called Kellogg Caribbean Inc. ("KCI"), are affiliates of each other, with Kellogg as their parent company.

Since the early 1910's, BFH has been responsible for the sale, distribution and merchandising of Kellogg cereal products in Puerto Rico.  It has (a) purchased Kellogg products for resale; (b) billed, given credit and received payment for the sale of the products; (c) made final agreements for the sale of the products with its clients; (d) established price and sale agreements with its clients; and (e) had its own sale force.  Over the years, Kellogg appointed different subsidiaries, including KUSA and KCSI, to manage that relationship with BFH.

The first written distribution agreement that a Kellogg company and BFH entered into dates back to at least January 1, 1961.  (See BFH Exhibit 16, Docket No. 233-3, 44.)  The 1961 agreement declared BFH "distributor for Puerto Rico" and provided that, for its efforts toward promoting the sale and obtaining and maintaining a distribution of Kellogg's ready-to-eat cereals in Puerto Rico, BFH would receive a commission on the price of all sales of products that were accepted by Kellogg for shipment to Puerto Rico.  (Id.)  It further provided that, if the agreement proved satisfactory to both parties, a renewal of the same was contemplated, effective January 1, 1962.  It went on to indicate, however, that "unless renewed" the agreement would be canceled as of December 31, 1961.  (See id. at 44-45.)  Subsequently, annual agreements containing exactly the same terms as the 1961 agreement, including the renewal/cancelation clause, were executed between BFH and KUSA for the years 1963, 1964, and 1965.  (See BFH Exhibit Nos. 18, 19, 21, Docket Nos. 233-3 at 48-49, 54-55, 59-60.)

On January 1, 1966, however, the parties entered into a new distribution agreement, similar to the previous ones but including more details about BFH's duties[1] and expressly providing that the

---

[1] The agreement included the following additional provisions regarding the distributor's duties and priviledges: the turn over of stock every thirty to forty-five days; commitment to extend the distribution of Kellogg products by constant and intelligent efforts to increase sales and add new customers; commitment to distribute the advertising material provided by Kellogg; duty to inspect the stocks of Kellogg products held by retailers, rotate that stock, and pick up unsalable products; duty to refund retailers for their purchase price of any unsalable merchandise picked up, with

agreement should not be construed as an exclusive distributor agreement. (See BFH Exhibit No. 23, Docket No. 233-3, 62-65.)  That clause went on to state that "nothing herein contained shall prevent Kellogg from selling its products to any party it may choose, notwithstanding that such party shall be located within the market area or that such party shall purchase for shipment to, or distribution within, the market area." (Id. at ¶ 13.)  In addition, the 1966 agreement included the following clause:

> This agreement shall constitute a renewal and complete restatement of the relationship between Kellogg and Distributor relative to the distribution of Kellogg's products within the market area.  To the extent that there are any existing agreements between Kellogg and Distributor respecting such relationship, all such agreements shall be deemed modified to conform to the provisions hereof.

(Id. at ¶ 14.)  The agreement further provided that it could be "altered, amended, or renewed only by a new agreement in writing signed by Distributor and Kellogg by an officer thereof," (id. at ¶ 12.) and that "upon termination or cancellation of this agreement, or any renewal thereof, Distributor agrees to discontinue immediately the use of any or all" of Kellogg's trademarks, trade names, brands, slogans, and/or advertising devises (id. at 10).

    The parties entered into distribution agreements for the years 1967 through 1992[2] that contained the same conditions as the 1966 agreement, including the non-exclusivity and renewal/cancelation clauses.[3] (See BFH Exhibit Nos. 28, 30, 34, 36, Docket No. 233-3, 75-79, 85-

---

subsequent reimbursement by Kellogg; duty to submit monthly reports to Kellogg's Caribbean Sales Supervisor; and a functional discount of 5% on the prices stated in Kellogg's price list.  The 1966 agreement also did not include one provision that was present in the previous agreements: that commission would not be paid on shipments made by wholesale grocers, exporters or Government agencies, from their stocks.

[2] The parties both admitted that a similar agreement had been reached for the year 1981, though the document presented in support of this contention was actually a copy of the contract for the year 1980.  (See Exhibit No. 58, Docket No. 233-4, 72-75.)

[3] A couple of changes were incorporated along the way.  The 1968 agreement expanded BFH's market area for Kellogg products to include St. Croix and the U.S. Virgin Islands, in addition to Puerto Rico and St. Thomas.   (See Exhibit No. 30, Docket No. 233-3, 85-88.)  Also, the agreement for 1973 added a provision regarding the terms of payment. (See Exhibit No. 43, Docket

Civil No.  07-1213 (GAG/BJM)          5

88, 92-95, 97-99; BFH Exhibit Nos. 38, 37, 43, 48, 49, 51, 52, 54, 56, 57, 59, 60, 61, 62, Docket No.

233-4, 5-7, 2-4, 23-26, 36-39, 41-44, 47-50, 52-55, 57-59, 62-65, 67-70, 76-79, 81-84, 86-91, 93-98;

BFH Exhibit Nos. 63, 64, 65, 66, 67, 68, 69, Docket No. 233-5, 1-6, 8-13, 15-20, 22-27, 29-34, 36-

40, 42-45.)  In addition, the 1992 distribution agreement provided that KUSA had the right, at its

sole discretion and upon notice to BFH, to assign the agreement to an affiliated company.  (See BFH

Exhibit No. 69 at ¶ 15.)

After 1992, BFH and KCSI negotiated a draft of a distribution agreement but the parties did

not come to terms and the document was not finalized.  Since then, BFH continued distributing

Kellogg products in Puerto Rico without interruption. However, the parties did not execute any

further written agreements until 2004.  The deposition testimony of the parties' executives reflects

that Kellogg did not appoint another distributor, besides BFH, for the sale of Kellogg cereal products

in Puerto Rico during this time.  (See, e.g., BFH Exhibit No. 111, Docket No. 233-7 at 31, 46-47.)

In 1993, KCSI was organized as a wholly owned subsidiary of Kellogg with the objective of

providing marketing and advertising support for the sales of Kellogg products in Puerto Rico and

the Caribbean.  Thereafter, KCSI had an active role in the advertising of Kellogg products in Puerto

Rico.  KUSA subsequently made a verbal assignment of the 1992 distribution agreement to KCSI

for no monetary consideration.

In 1996, Kellogg changed the sourcing of the manufacturing of Kellogg products sold in

Puerto Rico to Mexico to improve their competitiveness and reduce the price of Kellogg products

in Puerto Rico.  Because some of the products to be sold in Puerto Rico would still need to be

imported from the United States, that same year the parties established a distribution center for

Kellogg's cereal products at Royal Office Park in Cataño, Puerto Rico, to consolidate the products

in one place.  BFH leased the building that housed the distribution center and, with the consent of

Kellogg, sub-contracted a company named Dimalsa to provide third-party logistics services at the

distribution center.  In 2004, Kellogg reimbursed BFH for the cost of both the lease and the payment

to Dimlasa and KCSI assumed the lease for the distribution center.  BFH provided logistics and

No. 233-4 at 24.)  The court also notes that these contracts were entered into by BFH with either

KSC or Kellogg.

warehousing (product rotation) services at the distribution center in Cataño, through its affiliate CWL, which was created for that purpose in 2003.

On or about May 28, 2003, Kellogg and BFH agreed that Keebler Company/Puerto Rico, Inc. ("Keebler") would distribute certain Kellogg products in Puerto Rico and BFH would receive a 3.5% commission of the total sales made by Keebler of Nutri-Grain Bars, Special K Cereal Bars (and others), Rice Krispies Treats, and Paketitos.  Jose Texidor, who was appointed BFH's president in 2003, testified that the agreement to pay BFH a commission on those sales responded to their concerns that the distribution services provided by Keebler would undermine BFH's position as exclusive distributor for Kellogg in Puerto Rico.  (See BFH Exhibit No. 100, Docket No. 233-6, 71.) According to Mr. Texidor, these concerns were communicated to Kellogg's General Manager, William Derrenger.  (See BFH Exhibit No. 100, Docket No. 233-6, 71.)  The commission was paid to BFH, but Kellogg denies BFH's allegations regarding their motivation or that BFH was an exclusive distributor.

In contrast, however, a contemporaneous internal audit of the Kellogg Company noted that "Kellogg Caribbean is selling product to Keebler company through the B. Fernandez distributor, due that K Caribbean is not allowed to sell directly to anyone more in the Puerto Rico island, even as an inter-company transaction (because of the contract between KC & BF)."  (BFH Exhibit No. 106, Docket No. 244-6, 11.)  The audit further noted that "Kellogg Caribbean should arrive an [sic] agreement with B. Fernandez in order to sell product directly to Keebler as an inter-company sale, and pay the commission to B. Fernandez in order to prevent any discrepancy with KC distributor." (Id.)

On December 28, 2003, Keebler merged into KCSI.  In April 2004, BFH complained to KCSI when it found out that KCSI had sold Kellogg's Handipack cereals directly to clients in Puerto Rico.  Immediately thereafter, KCSI stopped selling those products to retail clients.

On October 15, 2004, KCSI and BFH executed an "Agreement to Purchase Inventory" (the "2004 agreement") (See BFH Exhibit 123, Docket No. 233-12, 1-3.)  This agreement was for the purchase of all of BFH's resalable inventory of Kellogg products held at the distribution center.  It provided that "KCSI is the assignee of a certain Distribution Agreement, effective January 1, 1992

between its affiliate KUSA and BFH." (Id. at 1.)  It further provided that "[t]he Agreement and the

activities it contemplates do not extinguish, supersede, or terminate the Distribution Agreement,

which, except as expressly modified by this Agreement, continues in full force and effect." (Id. at

2.) Angel Vazquez, who was BFH's General Manager from 2003 to 2007, tesitified at his deposition

that before executing the contract, a meeting was held between himself, Mr. Texidor, Mr. Derrenger,

and another BFH executive, Mildred Garcia, who was Comptroller and Vice President of Finance

for BFH, to discuss the purchase agreement. (See Kellogg Exhibit RRR, Docket No. 234-77, 6.)

Ivan Santos, President of CWL, also took part in the decision-making leading up to the signing of

the 2004 inventory purchase agreement. (See Kellogg Exhibit KK, Docket No. 234-39, 4.) Mainly,

this process involved determining the inventory count and the purchase price for the transaction.

(Id.)

      The 2004 agreement was drafted by Kellogg and signed by Mr. Texidor, on behalf of BFH,

and by Mr. Derrenger, on behalf of Kellogg.  Mr. Texidor, however, has stated that he did not

consent to the preamble of the 2004 agreement, wherein the 1992 distribution agreement is

mentioned as having been "in full force and effect," and that he considered the 2004 agreement as

merely a purchase of inventory. (BFH Exhibit No. 138, Docket No. 233-13, 42-43.) Mr. Texidor

has also stated his belief that the purchase agreement was part of a hidden agenda to take the Kellogg

line away from BFH. (Id.) Mr. Derrenger has denied allegations made by BFH that the decision to

purchase the Kellogg inventory owned by BFH had to do with a concerted plan to terminate BFH

as Kellogg's distributor for Puerto Rico. (See BFH Exhibit 134, Docket No. 244-12, 13.) KCSI had

informed BFH that it wanted to integrate their warehouse and KCSI's administrative functions in

order to reduce costs. (See Kellogg Exhibit EE, Docket No. 234-33, 4.)  According to Mr.

Derrenger, negotiations for the purchase agreement began after BFH refused to move the inventory

to the Kellogg warehouse. (Id.) Mr. Derringer also testified that BFH required that Kellogg own

the inventory if it was going to be housed in the KCSI warehouse. (BFH Exhibit No. 132, Docket

No. 244-12, 11.) In contrast, Mr. Texidor testified that Kellogg was insisting on the purchase of the

inventory, even though BFH had indicated that it wanted to remain in control of the same regardless

of the warehouse consolidation. (See BFH Exhibit 124, Docket No. 233-12, 21.)  Mr. Texidor

further testified that before signing the agreement he consulted with an attorney regarding how BFH might be affected under Law 75 if it sold the inventory to Kellogg.  (See BFH Exhibit 124, Docket No. 233-12, 21.)  It was also his testimony that during negotiations leading up to the 2004 agreement he and Mr. Derrenger did not specifically discuss the continuation or termination of their distribution relationship.  (See Kellogg Exhibit QQQ, Docket No. 234-71, 9.)  Mr. Texidor testified, however, that "[a]ccording to Mr. Derrenger's attitude," he felt that if he did not sign the agreement, "the relationship between B. Fernandez and Kellogg [would] be terminated."  (Id.)  Nevertheless, Mr. Texidor also averred that Mr. Derrenger never threatened that KCSI would terminate their relationship if he did not sign the agreement, and he admitted that he always had a choice not to sign it.  (Id. 8-9.)

In a letter dated November 1, 2004, Mr. Derrenger notified Mr. Texidor that KCSI would begin selling Kellogg's Cereal-in-a-cup and Kellogg's Fruit Snacks products directly to customers via its own sales force.  (See BFH Exhibit No. 126, Docket No. 233-12, 28-30.)  In this letter, Mr. Derrenger outlined various reasons why Kellogg was dissapointed with BFH's results during the preceeding 18 month period, such as BFH's shortfall in delivering their budget commitment and a decline in Kellogg's market share.  Mr. Texidor, in turn, wrote Mr. Derrenger on November 12, 2004 to refute his contentions and indicate that KCSI was fabricating "an excuse to deny [BFH] the opportunity of distributing new Kellogg's products that are within the scope of [BFH and Kellogg's] distribution relationship."  (BFH Exhibit No. 127, Docket No. 233-12, 39.)  Notwithstanding, KCSI began to make direct sales to clients of the Cereal-in-a-cup product.  Mr. Texidor testified that, in an attempt to avoid litigation, he proposed to Mr. Derrenger that KCSI pay BFH the same 3.5% commission on the sales of Cereal-in-a-cup products that they had arranged for the Keebler sales in 2003.  (See BFH Exhibit No. 129, Docket No. 233-12, 50.)  This proposal was rejected.

On January 1, 2005, defendants BFH and CWL filed a complaint under Puerto Rico's Law 75, seeking that the court enjoin Kellogg USA, Inc. ("KUSA") from terminating their exclusive rights to distribute KUSA's products within Puerto Rico by permitting "it or its affiliates" to sell Cereal-in-a-cup directly to retailers.  (Civil No. 05-1030 (JP), Docket No. 1.)  In this first complaint, the court issued a preliminary injunction after an eight-day hearing to ensure that the business

relationship between the parties was not adversely affected during the course of the litigation.  The court ordered that KUSA continue distributing its Cereal-in-a-cup products through BFH and CWL, under the same terms that they currently sell other Kellogg-brand cereal products.[4]  (Civil No. 05-1030 (JP), Docket No. 133.)  KCSI attempted to intervene as of right pursuant to Fed.R.Civ.P. 24(a)(2).  (Civil No. 05-1030 (JP), Docket No. 48.)  The court denied their request (Civil No. 05-1030 (JP), Docket No. 99), after which KCSI appealed from the court's decision denying its intervention (Civil No. 05-1030 (JP), Docket No. 116) and KUSA appealed from the entry of the preliminary injunction (Civil No. 05-1030 (JP), Docket Nos. 134 & 135).

On appeal, the U.S. Court of Appeals for the First Circuit reversed the denial of the motion to intervene, after finding that KCSI was entitled to intervene as a matter of right under Fed.R.Civ.P. 24(a)(2).  See B. Fernandez & Hnos., Inc. v. Kellogg USA, Inc., 440 F.3d 541 (1st Cir. 2006).  The appellate court remanded the case and vacated the preliminary injunction while the district court considered whether KCSI should be joined for "just adjudication" as an indispensable party under Fed.R.Civ.P. 19(b).  On remand, the District Court determined that KCSI was an indispensible party and dismissed the complaint because, with KCSI's intervention in the case, there was no longer complete diversity between the parties. (Civil No. 05-1030 (JP), Docket No. 190.)  In January of 2007, BFH and CWL appealed from the dismissal, (Civil No. 05-1030 (JP), Docket No 192.) and KUSA cross-appealed (Civil No. 05-1030 (JP), Docket No. 193).  The First Circuit affirmed the district court's judgment on February 14, 2008.  See B. Fernandez & Hnos., Inc. v. Kellogg USA, Inc., 516 F.3d 18 (1st Cir. 2008).

---

[4] An initial temporary restraining order was first issued on May 17, 2005, after Kellogg took control of the Cataño distribution center.  (Civil No. 05-1030 (JP), Docket No. 47.)  According to the testimony of Mr. Santos, on May 4, 2005, Mr. Derrenger arrived at the CWL distribution center accompanied by private security guards and took physical possession of the facilities and changed the locks.  (See BFH Exhibit No. 130, Docket No. 244-11, 52-54.)  Mr. Derrenger then notified Mr. Santos of a letter terminating CWL's service contract, effective on June 4, 2005, though the services were effectively terminated upon the delivery of the notice. (Id.; see also Civil No. 05-1030 (JP), Docket No. 47.)  The court ordered that the contract for services at the distribution center with BFH and CWL be reinstated under the same conditions, that BFH and CWL be allowed to perform all the logistical services performed prior to the termination notice, and for Kellogg's affiliates to hand over the keys to the distribution center.

Civil No.  07-1213 (GAG/BJM)                    10

1         Meanwhile, on March 15, 2007, KUSA and KCSI filed their complaint in the instant case

2    (Docket No. 1) seeking to execute the bond BFH and CWL posted in relation to the preliminary

3    injunction that was issued in the previous case.[5]   On April 4, 2007, BFH and CWL answered the

4    complaint and filed a counterclaim alleging the same claims that were raised in the previous

5    complaint. (Docket No. 8.)  Namely, (1) impairment of the exclusive distribution agreement between

6    the parties, under both conventional contractual law and Law 75, (2) violating the implied covenant

7    of good faith and fair dealing in the ratification of the 2004 inventory purchase agreement, and (3)

8    breach of contract between KCSI and CWL for the termination of its warehousing services.

9         Both sides have moved for summary judgment on their respective claims.

10   **III.    Discussion**

11        Defendants move for summary judgment on the plaintiff's claims arguing that the current

12   distribution relationship between BFH and the Kellogg Company is exclusive, such that its decision

13   to start selling cereal products directly to clients in Puerto Rico constituted breach of the existing

14   relationship and impairment under Law 75.  They also argue that, if that is the case, KUSA and KCSI

15   would not be entitled to recover the costs allegedly incurred as a result of the preliminary injunction

16   order issued by the district court in the previous case, since they would not be able to prove that they

17   were wrongfully enjoined, and summary judgment in the defendants' favor would be appropriate.

18   Defendants also argue that, even though the distribution relationship between the parties predates the

19   enactment of Law 75, the law applies because the relationship was extinctively novated after the law's

20   enactment.  Alternatively, Defendants argue that there exists a binding, unwritten agreement between

21   the parties under Puerto Rico contractual law that grants Defendants the exclusive right to distribute

22   Kellogg's cereal products in Puerto Rico and that this agreement has been breached by KUSA and

23   KCSI.  Defendants also make various arguments against the validity of the parties' 2004 inventory

24   purchase agreement and its implications for the parties' distribution relationship.

25

26

27       [5] Plaintiffs' second and third claims for relief, which were for excess damages and recovery
of attorneys' fees incurred in the previous case, were voluntarily dismissed.  (See Docket Nos. 155,

28   156, 165.)

Plaintiffs, on the other hand, move for summary judgment on the defendants' counterclaim arguing that Law 75 cannot be constitutionally applied to a commercial relationship like that of BFH and Kellogg, which began and has continued uninterrupted since well before the enactment of Law 75 in 1964.   They contend that the parties have never intended nor acted to extinguish that relationship, and no radical changes constituting an extinctive novation have ocurred since 1964. Plaintiffs also argue that, on the facts and applicable law, they are entitled to summary judgment on Defendants' claims of "dolo" and breach of contract.

First, the court will address Plaintiffs' argument against the retroactive application of Law 75 to the parties' distribution relationship.

## A.       Applicability of Law 75

Law 75 protects Puerto Rican "dealers"[6] from a supplier's arbitrary dismissal.  It was designed to "remedy the abusive practices of suppliers who arbitrarily eliminated distributors after they had invested in the business" and had successfully established a market in Puerto Rico for the supplier's product or service.  Triangle Trading Co., Inc. v. Robroy Industries, Inc., 200 F.3d 1, 2 (1st Cir. 1999) (citations omitted).  Pursuant to Law 75, a supplier can not terminate its agreement with a dealer

---

[6] A "dealer" is defined by Law 75 as: "[a] person actually interested in a dealer's contract because of his having effectively in his charge in Puerto Rico the distribution, agency, concession or representative of a given merchandise or service." P.R. Laws Ann. tit. 10, § 278(a).  A "dealer's contract" is defined as:

> [the] relationship established between a dealer and a principal or grantor whereby and irrespectively of the manner in which the parties may call, characterize, or execute such relationship, the former actually and effectively takes charge of the distribution of a merchandise, or if the rendering of a service by concession or franchise, or the market of Puerto Rico.

P.R. Laws Ann. tit. 10, § 278(b).   The court notes that, in contrast to Puerto Rico's Sales Representative Act, P.R. Laws Ann. tit. 10 § 279 et seq., non-exclusive distributors are entitled to protection under Law 75, see generally Borschow Hosp. and Medical Supplies, Inc. v. Cesar Castillo, Inc., 96 F.3d 10 (1st Cir. 1996), although "it is equally true that Law 75 does not operate to convert non-exclusive distribution contracts into exclusive distribution contracts." Vulcan Tools of Puerto Rico v. Makita U.S.A., Inc., 23 F.3d 564, 569 (1st Cir. 1994) (citations omitted).  "[T]he 'established relationship' between dealer and principal is bounded by the distribution agreement, and therefore the Act only protects against detriments to contractually acquired rights." Id.

**Civil No.  07-1213 (GAG/BJM)**                12

except for just cause.[7]  P.R. Laws Ann. tit. 10, § 278(a).  "Just cause" is defined as "[n]onperformance of any of the essential obligations of the dealer's contract, on the part of the dealer, or any action or omission on his part that adversely and substantially affects the interests of the principal or grantor in promoting the marketing or distribution of the merchandise or service."  P.R. Laws Ann. tit. 10, § 278(b).  Thus, "[t]he practical effect of Act No. 75 is to extend the contract indefinitely, unless there is just cause for its termination or unless the principal is willing to pay damages which may result costly."  Warner Lambert Co. v. Corte Superior, 101 P.R. Dec. 378, 399, 1 P.R. Offic. Trans. 527, 556 (1973).

Emphasizing the drastic adverse effects that Law 75 had on principals, the Supreme Court of Puerto Rico held in Warner Lambert that the application of Law 75 to distributor relationships established before its effective June 1964 date violates the Contract Clause of the Constitution of Puerto Rico.  See P.R. Const. art. II, § 7.  The Court concluded that it would violate the constitutional guarantee against the impairment of contractual obligations to apply the statute to contracts in existence before its enactment.  The Court went further and reviewed the civil law doctrine on the extinction of obligations by novation, rejecting the argument that a post-Law 75 modification which increased the commission fixed in the dealer's contract, without more, resulted in extinguishing the pre-Law 75 obligation.  The Court also ruled, however, that any agreement that was extinctively novated after the enactment of Law 75 would fall within its protections.  In later cases, the issue of novation has been revitalized so that "its efficacy as a method of extinguishment while at the same time a creator of obligations is claimed constantly under different assumptions of fact in almost all cases filed under [Law 75]."  Marina Industrial, Inc. v. Brown Boveri Corp., 114 P.R. Dec. 64, 66-67,

---

[7]   Section 278(a) of Law 75 provides:

> Notwithstanding the existence in a dealer's contract of a clause reserving to the parties the unilateral right to terminate the existing relationship, no principal or grantor may directly or indirectly perform any act detrimental to the established relationship or refuse to renew said contract on its normal expiration, except for just cause."

P.R. Laws Ann. tit. 10, § 278(a).

14 P.R. Offic. Trans. 86, 91 (1983).

The Civil Code of Puerto Rico provides that an obligation may be modified by changing its object or principal conditions.  Art. 1157, P.R. Laws Ann. tit. 31, § 3241.[8]  However, in order for an obligation to be extinguished and substituted by another, "it is necessary that it should be so expressly declared, or that the old and new be incompatible in all points."  Art. 1158, Puerto Rico Civil Code P.R. Laws Ann. tit. 31, § 3242.  An extinctive novation may, therefore, occur in two different ways, both which reflect the fact that a novation is never presumed: (1) an express declaration of novation or (2) a tacit novation when there is a complete incompatibility between the old and superceding obligations.   Under the first conception, extinctive novation comes into play even when the contractual condition modified is of secondary importance, as long as that is what the parties intended and they have conclusively stated that the prior contract is canceled and substituted by another.[9]  Because novation is never presumed, the will to novate must be established without a trace of doubt.  See Warner Lambert, 101 P.R. Dec. at 389-90, 1 P.R. Offic. Trans. at 544-45 (citations omitted); see also Marina Industrial, 114 P.R. Dec. at 73-77, 14 P.R. Offic. Trans. at 100-103 (extinctive novation of dealership agreement existed, even though agreements were practically identical, because superseding agreement reflected at least some differences and provided that it should be viewed as "superseding and annulling any agreement heretofore entered into by and between the parties").  In the absence of an express declaration, extinctive novation operates only when the two obligations are absolutely incompatible.  "There must be such a radical change in the nature of the new obligation when compared with the old as to make them mutually excludable and unable to coexists."  Francisco Garraton, Inc. v. Lanman & Kemp-Barclay & Co., Inc., 559 F. Supp. 405, 407 (D.P.R. 1983) (citing Goble & Jimenez, Inc. v. Dore Rice Mill, Inc., 108 P.R. Dec. 89, 90, 8 P.R. Offic. Trans. 90, 95

[8] Article 1157 provides: "Obligations may be modified: (1) By the change of their object or principal conditions. (2) By substituting the person of the debtor. (3) By subrogating a third person in the rights of the creditor."

[9] Similarly, "[t]he modification of one of the *principal* conditions of the contract does not necessarily presuppose an extinctive novation, if that is not the express will of the parties."  Warner Lambert, 1 P.R. Offic. Trans. at 545 (emphasis added).

**Civil No.  07-1213 (GAG/BJM)**            14

(1978)).

The Supreme Court of Puerto Rico has warned that the particular facts of each case must be carefully examined to determine whether or not a novation occurred, for the termination of the preceding obligation carries with it the extinction of its guarantees and accessory rights.  Warner Lambert, 101 P.R. Dec. at 391-92, 1 P.R. Offic. Trans. at 547; Art. 1161, Puerto Rico Civil Code, P.R. Laws Ann. tit. 31, § 3245.  "Such drastic results can only be produced when the parties are fully aware of them."  Francisco Garraton, 559 F.Supp. at 407 (citing Warner Lambert, 101 P.R. Dec. at 391-92, 1 P.R. Offic. Trans. at 547).  Modifications that are mainly quantitative in nature do not extinguish the original main obligations.  Id. (citing Goble & Jimenez, 108 P.R. Dec. at 96-98, 8 P.R. Offic. Trans. at 96-99) (changes only quantitative where they involved the expansion of the distribution to include additional types of products and territory and to increase rate of commission)); see also Warner Lambert, 101 P.R. Dec. at 393-94, 1 P.R. Offic. Trans. at 549 (merely quantitative change found where original agreement only modified to raise the rate of commission).  Moreover, when extinctive novation has not been expressly declared, the will of the parties is the controlling factor in determining the type of novation involved.  Id.; see also Art. 1233, Puerto Rico Civil Code, P.R. Laws Ann. tit. 31, § 3471.[10]  The Civil Code and Puerto Rico's equivalent parol evidence rule, see P.R. Laws Ann. tit. 31, § 3471-3479 and P.R. Laws Ann. tit. 32, App. IV R. 69, permit resort to extraneous circumstances surrounding the document being interpreted when there appears to be conflict on the written context.  See also Merle v. West Bend Co., 97 P.R. Dec. 403, 97 P.R. 392 (1969).

In this case it is undisputed that the distribution relationship between the parties predates the enactment of Law 75.  Since then, the parties have entered into subsequent written distribution agreements on numerous occasions and certainly past the Law's enactment in June 1964.  The distribution agreements ratified between 1961 and 1965, however, are all the same and do not contain

---

[10]Article 1233 of the Civil Code provides: "If the terms of a contract are clear and leave no doubt as to the intentions of the contracting parties, the literal sense of its stipulations shall be observed.  If the words should appear contrary to the evident intention of the contracting parties, the intention shall prevail."

language that would indicate novation.  In contrast, the 1966 agreement contained more details regarding the parties' distribution relationship,[11] including a clause indicating that the relationship should be considered non-exclusive.  This contract was drafted and ratified every year between 1967 and 1992, with only a few further changes to its terms and conditions, such as the expansion of BFH's market area for Kellogg's products and changes to the terms of payment.  There was also language in the 1966 contract stating that the agreement "shall constitute a renewal and a complete restatement of the relationship between [the parties]."  (BFH Exhibit No. 23 at ¶ 14, Docket No. 233-3, 62-65.)  That clause went on to state that, "[t]o the extent that there are any existing agreements between [the parties] respecting such relationship, all such agreements shall be deemed modified to conform to the provisions hereof. "  (Id.)

Defendants argue that the renewal language cited above is an express declaration of the parties' will to extinctively novate.  Plaintiffs argue otherwise, suggesting that this language is an express statement of the parties' will *not* to novate, pointing out that the plain meaning of this provision, is to "renew" (i.e. restore) and "restate" (i.e. reiterate) the existing contract between the parties, not to supercede or cancel it.  Though the court finds Plaintiffs' argument more persuasive, it acknowledges that the cited language, combined with the rest of the clause, which speaks of modifying previous agreements to conform with the provisions of the new contract, could be interpreted in either sense.  Thus, the clause cannot be interpreted as establishing the will to extinctively novate, without a trace of doubt.  See Warner Lambert, 101 P.R. Dec. at 389-90, 1 P.R. Offic. Trans. at 544-45 (citations omitted).  Alternatively, Defendants argue that the new details contained in the 1966 agreement, especially the non-exclusivity provision, as well as the subsequent changes to the terms and conditions up to 1992, confirm the occurrence of a tacit extinctive novation.  After carefully reviewing the 1966 agreement, and all preceding and subsequent agreements up to 1992, the court finds that the modifications to the distribution agreement are purely quantitative in nature and did not significantly alter the distribution relationship, such as to make the old and new contracts "incompatible in all points."  Art. 1158, P.R. Laws Ann. tit. 31, § 3242.  Furthermore,

---

[11] See supra note 1 and accompanying text.

pursuant to <u>Marina Industrial</u>, 114 P.R. Dec. at 76-77, 14 P.R. Offic. Trans. at 103, changes such as providing for the exclusive representation of the principal in a distribution agreement, in combination with other secondary modifications, "by themselves [are] not [] sufficient to produce an extinctive novation because they are not 'totally incompatible'" with the previous obligation.  Therefore, the court cannot find sufficient modifications to conclude that any of the written agreements between 1966 and 1992 resulted in a tacit novation that extinguished the obligations between the parties, creating a new and entirely incompatible distribution agreement.

After 1992, the parties did not enter into any further written agreements until the inventory purchase agreement of 2004.  The 1992 agreement contained the same renewal/cancellation language as all previous agreements dating back to 1966, to the effect that "unless renewed [in writing by both parties], this Agreement is canceled as of [the end of the year]."  (BFH Exhibit No. 69 at ¶ 13, Docket No. 233-5, 42-45.)  Defendants argue that, since the parties did not enter into any subsequent written distribution agreements after the 1992 agreement expired, the same must be deemed cancelled by its own terms, such that an extinctive novation must have occured.  The court, however, is persuaded by Plaintiffs' counter argument, that the automatic cancellation of the 1992 agreement does not constitute an extinctive novation in and of itself.  Novation is never presumed, must be established without a trace of a doubt, and is always a question of intention.  <u>Warner Lambert</u>, 101 P.R. Dec. at 389-90, 1 P.R. Offic. Trans. at 544-45; <u>see also</u> <u>Merle</u>, 97 P.R. Dec. at 409-10, 97 P.R. at 399 ("[The] question of intention is so essential in the interpretation of the [sic] contracts that the Code proclaims its supremacy in providing that the evident intention of the parties shall prevail over the words, even when the latter would appear contrary to the intention.").  The intention to novate, in turn, must be derived from the concurrent circumstances of each case.  <u>Id.</u>  Thus, regardless of the written contract's cancellation as of December 1992, if the parties' distribution agreement has remained the same, a finding of extinctive novation is precluded.  <u>See</u> <u>Tavarez</u>, 903 F. Supp. at 272.  The question before the court is whether the parties intended to modify their distribution relationship after the expiration of the 1992 agreement in such way as to make it "incompatible in all points" with the previous agreement.  After careful consideration of all the admissible evidence presented by the parties in support of their motions, the court finds that there are issues of material fact which preclude a

summary finding of extinctive novation in the present case.

It is undisputed that during the 1990's Kellogg did not appoint any other distributor, besides BFH, for the sale of its products in Puerto Rico.  In 1993, however, KCSI was created as a subsidiary of Kellogg in Puerto Rico to help handle, *inter alia*, the promotion and advertising of Kellogg products in BFH's distribution area.   Subsequently, Kellogg changed the sourcing of the manufacturing of its products sold in Puerto Rico to Mexico, and a distribution center was established and run by BFH, who created CWL as a subsidiary to handle logistics services.  In May 2003, Kellogg and BFH agreed that KCSI would begin to sell certain cereal products through its Keebler sales force, and that BFH would receive a commission on those sales.  There is conflicting evidence on the record as to whether both parties intended for this commission to protect Kellogg from liability regarding BFH's status as exclusive distributor for Puerto Rico, and whether Kellogg even recognized BFH as exclusive distributor for the area.  More importantly, however, in 2004 the parties entered into an agreement whereby Kellogg purchased all of BFH's resalable inventory of Kellogg products held at the distribution center.  Prior to that, KCSI had sold Kellogg's Handipack cereals directly to clients in Puerto Rico.  When BFH found out about this, it complained to Kellogg and they discontinued the practice.  After the purchase of BFH's inventory, however, Kellogg began, once again, to sell certain of its cereal products directly to clients in Puerto Rico.  Those are the products currently at issue in this litigation.  The court understands that the conduct of the parties after 1992, and particularly surrounding the 2004 agreement to purchase inventory, suggests a qualitative shift in the way of conducting business between the parties that a reasonble trier of the facts could conclude raises to the level of a tacit extinctive novation.

Furthermore, Defendants contest the reliability of the 2004 contract, which included provisions that indicate that the 1992 distribution agreement has remained in force and without alteration since its cancellation.  They point to evidence of allegedly "insidious machinations" which vitiate their consent; in particular, that Kellogg intended to slowly eliminate BFH as its Puerto Rico distributor and that it believed that Law 75 did in fact apply to their distribution arrangement.  The court will discuss *infra* whether from the evidence presented it can be concluded that Kellogg's alleged false representations vitiated Defendants' consent regarding the 2004 agreement.  Regardless,

however, the court finds that the evidence presented by Defendants creates an issue of material fact as to the intentions of the parties at the time the contract was signed regarding their distribution arrangement, and could lead a reasonable jury to conclude that there was in fact a will to novate.

For the foregoing reasons, the court **DENIES** Plaintiffs' motion for summary judgment as to the Defendants' Law 75 counterclaim.

**B.     Defendants' Counterclaim of Contractual Deceit ("Dolo")**

Dolus or "dolo" is a form of contractual deceit that can serve to invalidate consent to an otherwise valid contract or compromise.  See Art. 1716, Puerto Rico Civil Code, P.R. Laws Ann. tit. 31, § 4828 (providing that a compromise in which "error, deceit, violence or forgery of documents is involved, shall be subject to section 3404 of this title"); Art. 1217, Puerto Rico Civil Code, P.R. Laws Ann. tit. 31, § 3404 (providing that "consent given by error, under violence, by intimidation or deceit shall be void.")  As it is defined in the Civil Code of Puerto Rico, contractual deceit occurs "when by words or insidious machinations on the part of one of the contracting parties the other is induced to execute a contract which without them he would not have made." Art. 1221, Puerto Rico Civil Code, P.R. Laws Ann. tit 31, § 3408.   Thus, the party alleging dolo has the burden of demonstrating: (1) a false representation by the defendant; (2) the plaintiff's reasonable and foreseeable reliance thereon; (3) injury to the plaintiff as a result of the reliance; and (4) an intent to defraud.  See Puerto Rico Elec. Power Authority v. Action Refund, 515 F.3d 57, 66-67 (1st Cir. 2008) (citing Microsoft Corp. v. Computer Warehouse, 83 F. Supp. 2d 256, 262 (D.P.R. 2000)).

The applicable Puerto Rico contract law regarding fraud has a strong underlying presumption in favor of good faith and honesty.   The party alleging fraud has the burden of presenting evidence which is "strong, clear, unchallengeable, convincing, and conclusive, since a mere preponderance of the evidence is not sufficient to establish the existence of fraud in [Puerto Rico]."  Prado Álvarez v. R.J. Reynolds Tobacco Co., 313 F. Supp. 2d 61, 77 (D.P.R. 2004) (quoting F.C. Imports, Inc. v. First Nat'l Bank of Boston, N.A., 816 F.Supp. 78, 87 (D.P.R. 1993)), aff'd, 405 F.3d 36 (1st Cir. 2005). Moreover, in determining whether to permit invalidation of a contract on the basis of dolo, Puerto Rico courts place considerable weight on the education, social background, economic status, and business experience of the party seeking to avoid the contract.  Cabán Hernández v. Philip Morris

**Civil No.  07-1213 (GAG/BJM)**                19

USA, Inc., 486 F.3d 1, 12 (1st Cir. 2007) (citing Miranda Soto v. Mena Ero, 109 P.R. Dec. 473, 477-78, 9 P.R. Offic. Trans. 628, 633-34 (1980)).

In the second cause of action of their counterclaim, Defendants claim that Plaintiffs engaged in fraud by using "words and insidious machinations" to induce BFH to execute the 2004 agreement to purchase inventory and its purported amendment to the distribution relationship.  The defendants' claim of contractual deceit is based on the theory, previously referred to in this opinion, that Kellogg had a concerted plan to eliminate BFH as their distributor for the Puerto Rico market, and that due to Kellogg's false representations BFH agreed to sell their Kellogg inventory to KCSI in 2004.  Had BFH been aware of Kellogg's intentions when they entered into the agreement, argue Defendants, they would not have agreed to the inclusion of language in the preamble of the 2004 agreement that "resurrects" the 1992 distribution agreement, which had expired twelve years earlier.  Defendants further argue that at no time during the negotiations for the 2004 agreement did the terms of the distribution relationship come into play.  Mr. Texidor was purposefully mislead by Mr. Derrenger into signing an inventory purchase agreement in which he incorporated, without previous notice, language intending to alter the nature of the distribution relationship between the parties.  Plaintiffs argue in opposition that BFH entered into the 2004 agreement only after its sophisticated management team, assisted by its outside counsel, fully and fairly considered all the terms of the Agreement.  Plaintiffs argue that Defendants should, therefore, be held accountable for all of the clauses of the contract.

After reviewing the evidence presented and the applicable caselaw, the court concludes that Defendants cannot present strong and unchallenged evidence which establishes the existence of fraud.  "Puerto Rico law places little weight on a sophisticated and experienced business party's assertion of unknowing reliance."  Puerto Rico Elec. Power Authority, 515 F.3d at 67 (citing Ramirez, Segal & Latimer v. Rigual, 123 P.R. Dec. 161, 176-77, 23 P.R. Offic. Trans. 156, 166 (1989) (finding that the parties were "savvy businessmen" and "persons well versed in business and financial matters" and concluding that they must have been aware of the possible outcome of the contract's terms); Planned Credit of Puerto Rico, Inc. v. Page, 103 P.R. Dec. 245, 256, 3 P.R. Offic. Trans. 341, 355 (1975) (looking at the plaintiff's education and business experience in rejecting claim that he was deceived and induced into the transaction)).  Given the business sophistication of BFH and CWL, the review

of the 2004 agreement by four of the companies' executives, and Mr. Texidor's admission that he consulted with an attorney prior to signing the agreement, it would be unreasonable as a matter of law for BFH to have relied on Kellogg's alleged misrepresentation.  Therefore, the court must **GRANT** Plaintiffs' motion for summary judgment and dismiss Defendants' claim of contractual deceit.

**C.     Validity the 2004 Agreement to Purchase Inventory and of the Assignment to KCSI of the 1992 Distribution Agreement**

Defendants move the court to determine that the provisions of the 2004 agreement regarding the parties' distribution relationship are invalid because the assignment of the 1992 distribution agreement from KUSA to KCSI, which is referenced in the 2004 agreement, was allegedly illegal under the Puerto Rico Civil Code.  Plaintiffs counter that Defendants are precluded from bringing this argument on summary judgment because Defendants did not timely amend their counterclaim to include a claim of nullity regarding the 2004 contract.  Specifically, on June 16, 2009, Defendants were denied a motion for leave to amend their second cause of action to add a new claim or request relief to annul the 2004 agreement.  (See Docket No. 228.)  Defendants, in turn, argue that the invalidity of the assignment is being brought, not merely to establish the nullity of the 2004 agreement, but to prove that the relationship between BFH and KCSI is exclusive.  The Plaintiffs' claim for execution of the bond in the previous case hinges on whether KUSA and KCSI had a right to sell products directly to their consumers.  Therefore, according to Defendants, BFH must bring the argument that the assignment was invalid in order to refute Kellogg's claim that the 1992 agreement, and its non-exclusivity clause, are still in force.

The court finds that Defendants are indeed precluded from requesting of  the court that it declare the 2004 assignment null.  This court had previously found that Defendants had ample time to amend their pleadings to include their claim of nullity but failed to adequately do so.  (Docket No. 228 at 2.)  Moreover, it determined that an amendment at such a late stage in the pleadings "would unfairly prejudice the plaintiffs and unduly delay this case."  (Id.); accord Astoria Jewelry v. N. Barquet, Inc., 291 F. Supp. 2d 16, 23-24 (D.P.R. 2003) ("failure to announce a new legal theory thwarts the ability of the parties to proceed with the disposition of the case in a fair and efficient manner").  Notwithstanding, the court understands that Defendants may bring their argument as it

pertains to the invalidity of the assignment itself.

As pointed out by Defendants, the invalidity of the assignment goes to the question of whether or not the parties were governed by the 1992 distribution agreement, per the "whereas" provision of the 2004 inventory purchase agreement. Plaintiffs themselves have argued that the "whereas" provision in the 2004 agreement, which they contend gave notice to BFH of KUSA's assignment to KCSI, is expressly severable from other provisions of the 2004 agreement. The savings clause in the 2004 agreement states that "[i]f any provision of this Agreement, or such provision's application to any person or circumstances shall be held invalid, this will not affect the remainder of this Agreement or such provision's application to any other person or circumstances." (BFH Exhibit 123 at ¶ 6, Docket No. 233-12, 1-3.) The First Circuit approves the use of standard savings clauses, which "serve[] as an expression of the intent of the parties that limits the remedies an arbitrator or court may use in situations of conflict between contract terms and applicable law." Kristian v. Comcast Corp., 446 F.3d 25, 48 n.16 (1st Cir. 2006) (severing a portion of an arbitration agreement where the savings clause in question emphasized the use of severance as a remedy, and declaring the remainder of the contract valid); see also Santiago-Sepulveda v. Esso Standard Oil Co. (Puerto Rico), 634 F. Supp. 2d 201, 210-11 (D.P.R. 2009). The savings clause in the 2004 distribution agreement expresses the intent of the parties that any invalid terms be severed from the contract in order to save the remainder of the agreement. The essence of the agreement – the purchase of inventory – remains intact in the absence of the severable clauses. Thus, the court may consider the validity of the assignment to KCSI by KUSA of the 1992 distribution agreement and, if it determines that the same was invalid, can choose the remedy of severability.

In the 1992 distribution agreement, KUSA and BFH "specifically acknowledge[d] that Kellogg ha[d] the right, in its sole discretion, upon notice to Distributor, to assign [the] Agreement to an affiliated company." (BFH Exhibit No. 69 at ¶ 15, Docket No. 233-5, 42-45.) It is undisputed that at some point after the creation of KCSI in 1993, KUSA made a verbal assignment of the 1992 distribution agreement to KCSI for no monetary consideration. Defendants argue that the assignment was invalid for various reasons. First, Plaintiffs never gave BFH notice of the assignment to KCSI, as required by the agreement itself and the laws of Puerto Rico. Plaintiffs counter by arguing that the

**Civil No.  07-1213 (GAG/BJM)**                22

"whereas" provision in the 2004 agreement provided the required notice by stating that "KCSI is the assignee of a certain Distribution Agreement, effective January 1, 1992 between its affiliate, Kellogg USA, Inc. [] and BFH []." (BFH Exhibit No. 123, Docket No. 233-12, 1.)  Second, Defendants argue that the assignment was invalid because the 1992 agreement had expired by its own terms on December 31, 1992, so that it was no longer a valid contract by the time it was assigned to KCSI. Lastly, Defendants contend that the assignment was invalid because BFH did not provide its consent and, alternatively, because it was assigned for no monetary consideration.

The Supreme Court of Puerto has defined "cesion de credito," or assignment of credit, as "that operation whereby a third person, substituting the creditor, comes into the possession of an obligation that, nonetheless, remains the same." IBEC v. Banco Comercial, 117 P.R. Dec. 371, 376, 17 P.R. Offic. Trans. 446, 453 (1986) (citations omitted).  "The assignee holds the same position and binding relationship with regard to the debtor from the moment the credit is transferred." Id. (citations omitted).  "For the transfer of a right or credit through assignment to be valid there must be a transferable credit grounded on a valid and efficient title." Id., 177 P.R. Dec. at 377, 17 P.R. Offic. Trans. at 453-54 (citations omitted);  In other words, "[i]t must be an existing credit originating from a valid and efficient obligation." Id.; see also Consejo de Titulares v. C.R.U.V., 123 P.R. Dec. 707, 1993 P.R. -Eng. 840 (1993).  Furthermore, "[f]or the assignment to be efficient before third persons, its date must be in the authentic manner provided by the Code," since "[n]otice is the technical instrument that links the debtor with the assignee." IBEC, 177 P.R. Dec. at 377, 17 P.R. Offic. Trans. at 454 (citations omitted).  Thus, "[a]lthough the asignee becomes the new creditor, the debtor who is unaware of the assignment of credit is protected by law since he is released from the obligation if he pays the original debtor before he learns about the assignment." Consejo de Titulares, 132 P.R. Dec. at 717-18, Offic. Slip Trans. at 6 (citing Article 1417 of the Civil Code of Puerto Rico, P.R. Laws Ann. tit. 31, § 3942).  "Only when the debtor consents to the assignment does he lose his right to oppose compensation against the asignee . . . When there is just a mere notice and the debtor has not given his consent, 'he may oppose compensation for prior debts, but not for subsequent ones.'" IBEC, 117 P.R. Dec. at 378, 17 P.R. Offic. Trans. at 455 (quoting Article 1152 of the Civil Code of

Puerto Rico, P.R. Laws Ann. tit. 31, § 3224)[12].

Thus, contrary to Defendants' assertions, under Puerto Rico law the assignment of a contract to a new creditor does not require a debtor's consent, nor does it require notice.  The assignment is simply not efficient against the debtor until the debtor is given notice.  Similarly, consent by the debtor (or lack thereof) is only relevant in as much as the debtor might wish to "oppose compensation" (i.e. set off) for prior debts with the original creditor, see Art. 1152, Puerto Rico Civil Code, P.R. Laws Ann. tit. 31, § 3224, and in no way does lack of consent bar the effect of the assignment upon the debtor once notice is given. IBEC, 117 P.R. Dec. at 378, 17 P.R. Offic. Trans. at 455 (citation omitted).

Plaintiffs contend that notice was effected upon the execution of the 2004 agreement, wherein the parties acknowledged the existence of the assignment.  Defendants posit that such notice is insufficient, because Article 1416 of the Puerto Rico Civil Code, P.R. Laws Ann. tit. 31, § 3941, requires that notice of an assignment be given through a public instrument (i.e. a notarized document).  The court, however, agrees with Plaintiffs that the act of executing an agreement in which the parties stipulate that an assignment was executed should constitute sufficient notice as to those parties regarding the contents of the alleged assignment.  Defendants misinterpret Article 1416 of the Puerto Rico Civil Code, which states that "[t]he assignment of a credit, right, or action shall produce no effect against a third person *but from the time the date is considered fixed, in accordance with §§*

---

[12] Article 1152 of the Civil Code provides as follows:

A debtor who may have consented to the assignment of rights made by a creditor in favor of a third person, cannot oppose, against the assignee, the compensation which should pertain to him against the assignor.

If the creditor gave him notice of the assignment and the debtor did not consent thereto, he may oppose compensation for prior debts, but not for subsequent ones.

If the assignment is made without knowledge of the debtor, he may oppose compensation for prior credits, and for subsequent ones, until he should have been informed of the assignment.

P.R. Laws Ann. tit. 31, § 3224.

*3273 and 3282 of this title*." P.R. Laws Ann. tit. 31, § 3941 (emphasis added).  The sections referred to in the cited disposition provide that public instruments, in and of themselves, give sufficient notice to third parties of their contents and the date in which they were executed, and that the effective date of a public instrument shall be the date on which it is filed or entered in the public registry.  See P.R. Laws Ann. tit. 31, § 3273 and 3282.  However, the Puerto Rico Supreme Court has established that these dispositions refer to the evidentiary weight to be accorded to a public instrument and do not exclude the possibility of establishing the effective date of a contract, or its contents, with regard to third parties by other means.  See Segarra v. Viuda de Llorens, 101 Pr. Dec. 731**,** 734, 1 P.R. Offic. Trans. 996, 999-1000 (1973) (citing cases); see also Building Maintenance Serv. v. H.R. Exec. Bldg., 109 P.R. Dec. 656, 668, 9 P.R. Offic. Trans. 876, 891 (1980).  In other words, if an assignment is recorded by means of a public instrument, it is effective against third parties as of the date of the instrument's recordation in the public registry (or its filing), but absent recordation the transaction may be verified as authentic and notified by other means.  See Camara Insular de Comerciantes Mayoristas v. M. Anadon, S. en C., 83 P.R. Dec. 374, 383 n.4, 83 P.R. 360, 368 n.4 (1961) (holding that testimonial evidence may suffice to prove the assignment of commercial credits) (citing M. Rodriguez & Cia., S. en C., v. Hijos de J.F. Mari, 35 P.R. Dec. 559, 35 P.R. 512 (1926)).[13]

In support of their alternative argument that the assignment is invalid because it was made without monetary consideration, Defendants cite Article 1249 of the Civil Code of Puerto Rico, which provides that all contracts that are executed without monetary consideration are presumed to have been executed to defraud creditors.  P.R. Laws Ann. tit. 31, § 3498.  However, the court is presuaded by Plaintiffs' argument that Defendants lack standing to bring this argument before the court.  Defendants are not creditors within the meaning of Article 1249, neither are Plaintiffs debtors in this case within the meaning of the provision.  See Peña v. Mendoza, 60 P.R. Dec. 110, 60 P.R. 107 (1942).

Notwithstanding the above, the court finds that there is an issue of material fact as to

---

[13] The court also notes that the assignment contract is not among those listed in the Civil Code as requiring recordation in a public instrument.  See P.R. Laws Ann. tit. 31, § 3453.

Defendants' argument that the assigment cannot be valid because the contract that was allegedly transferred had expired by its own terms in 1992.  As previously stated, one of the requirements for a valid assignment is that the credit to be assigned be grounded on a "valid and efficient title." IBEC, 107 P.R. Dec. at 377, 17 P.R. Offic. Trans. at 453-54.  The fact that the 1992 contract expired on its own terms in December 1992, does not mean that the agreement contained therein did not remain in effect between the parties, per their business conduct and agreements outside of the written contract. See Merle v. West Bend, 97 P.R. Dec. 386, 97 P.R. 392 (1969).  There is testimonial evidence in the record from Kellogg executives to the effect that the parties understood their relationship to be governed by the provisions of the 1992 agreement after December 1992.  Defendants, on the other hand, have provided testimony by BFH and CWL executives that the 1992 agreement was no longer in force after December 1992.  The issue turns, therefore, on a matter of credibility better left for a jury to decide.

For the foregoing reasons, the court **DENIES** Defendant's motion for summary judgment as to the validity of the assignment to KCSI of the 1992 distribution agreement.

**D.     Exclusivity**

It follows from the foregoing that there are issues of material fact that preclude a finding on summary judgment for either of the parties on the question of exclusivity.  The nature of the parties' relationship is heavily contested by evidence from both sides.  For example, there is evidence that in 2003, KCSI and BFH agreed that KCSI would sell certain products through its Keebler sales force, and pay BFH a commission on said sales.  This arrangement arguably evinces BFH's rights to exclusive distribution.  BFH was also Kellogg's sole distributor for the relevant market area during the course of their relationship.  On the other hand, in 2004 KCSI informed BFH of its intent to purchase the latters' entire inventory of Kellogg cereal products warehoused at the distribution center, a move that BFH resisted but to which it eventually acceded.  This contract contains language that establishes the 1992 distribution agreement as the instrument controlling the distribution relationship between the parties.  The 1992 distribution agreement, in turn, characterized the distribution relationship between the parties as non-exclusive.  As pointed out by the defendants, however, that language is couched in the preamble and miscelaneous provisions of the agreement, which is

primarily focused on the sale of the inventory.  The 2004 document, therefore, contains no express language regarding exclusivity.  What is more, per the court's previous pronouncements there are issues of material fact regarding the validity of the assignment of the 1992 contract.

Having found that issues of material fact remain which preclude summary disposition, the court **DENIES** both parties' motions on the question of exclusivity.

### C.     Execution of Bond

Under First Circuit precedent, before Plaintiffs may collect on the bond that BFH and CWL posted in relation to the preliminary injunction issued in the previous case, there must be a finding that they were "wrongfully enjoined."  A "party is wrongfully enjoined when it had a right all along to do what it was enjoined from doing."  Global Naps, Inc. v. Verizon New England, Inc., 489 F.3d 13, 22 (1st Cir. 2007).  As the court interprets Global Naps, this requires a finding that BFH and CWL's claims against KUSA and KCSI  in the previous case lack merit.  In other words, the court has to determine whether KUSA and KCSI had a right to distribute their products through outlets other than BFH and CWL.  This determination depends on (1) whether KUSA and KCSI had a right to terminate or perform an act deterimental to the established distribution relationship between the parties (i.e. if Law 75 is inapplicable), see P.R. Laws Ann. tit. 10, § 278(a), and (2) whether independent of the applicability of Law 75, the contractual agreements between the parties allowed for non-exclusive distribution.  Having found issues of material fact regarding precisely these questions, the court **DENIES** Defendants' motion for summary judgment as to the Plaintiffs' claim for execusion of the bond under 20 U.S.C. § 1352.

### III.     Conclusion

For the foregoing reasons, the court **DENIES** Defendants' motion for summary jugment (Docket Nos. 231 & 233).  Plaintiffs' motion for summary judgment (Docket Nos. 232 & 234) is **DENIED in part and GRANTED in part**.  Accordingly, the court dismisses Defendants' Puerto Rico law claim of contractual deceit.

**SO ORDERED**.

In San Juan, Puerto Rico this 27th day of January, 2010.

*S/Gustavo A. Gelpí*
GUSTAVO A. GELPÍ
United States District Judge